## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE: MID-AIR COLLISION IN WASHINGTON, D.C., JAN. 29, 2025 | Lead Case No. 1:25-cv-03382-ACR |
| Plaintiffs, | |
| v. | |
| American Airlines, Inc., PSA Airlines, Inc., and United States of America, | |
| Defendants. | |

## REPLY IN SUPPORT OF AMERICAN AIRLINES, INC.'S
## MOTION TO DISMISS THE MASTER COMPLAINT

William F. Gould (Bar No. 428468)
HOLLAND & KNIGHT LLP
800 17th Street, NW
Washington, DC 20006
(202) 955-3000
william.gould@hklaw.com

Steven Raffaele (Bar No. NY0685)
Robert J. Burns (Bar No. NY0682)
Sarah Korapaty (Bar No. NY0684)
Qian (Sheila) Shen (Bar No. NY0693)
HOLLAND & KNIGHT LLP
787 Seventh Avenue
New York, NY 10019
(212) 513-3200
steven.raffaele@hklaw.com
robert.burns@hklaw.com
sarah.korapaty@hklaw.com
qian.shen@hklaw.com

Paul W. Hughes (Bar No. 997235)
Sarah P. Hogarth (Bar No. 1033884)
Mary H. Schnoor (Bar No. 1740370)
Alex C. Boota (Bar No. 90001014)
MCDERMOTT WILL & SCHULTE LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mwe.com
shogarth@mwe.com
mschnoor@mwe.com
aboota@mwe.com

*Attorneys for Defendants American Airlines, Inc. and PSA Airlines, Inc.*

**ORAL ARGUMENT SCHEDULED FOR FEBRUARY 27, 2026, at 10:30 a.m.**

**TABLE OF CONTENTS**

Table of Authorities ............................................................................................................. ii

Introduction ............................................................................................................................ 1

Argument ............................................................................................................................... 2

    A.    Federal law preempts state standards of care, and Plaintiffs have not alleged that American violated a federal standard of care ............................................ 2

        1.    Congress intended federal law to occupy the field of aviation safety. .................. 3

        2.    Plaintiffs effectively concede that they have not alleged that American violated a federal standard. ........................................................ 13

            a.    Training, instruction, and supervision. ............................................ 13

            b.    Aircraft lighting ............................................................................... 14

            c.    Safety risk management ................................................................... 15

            d.    Flight scheduling ............................................................................. 16

        3.    Plaintiffs' claims fail even under a conflict preemption analysis. ........................ 16

    B.    The Airline Deregulation Act expressly preempts the scheduling claims. .................. 18

    C.    Plaintiffs have not alleged American owed them a duty ............................................. 21

    D.    The common carrier claims should be dismissed for additional reasons. .................... 24

Conclusion ............................................................................................................................ 25

# TABLE OF AUTHORITIES[*]

**Cases**

*Abdullah v. Am. Airlines, Inc.*,
  613 F.3d 119 (3d Cir. 2010)...........................................................7, 10, 11, 12, 13

*In re Air Crash at Lexington, Aug. 27, 2006*,
  2008 WL 2945944 (E.D. Ky. 2008) ...............................................................22

*In re Air Crash Near Clarence Ctr.*,
  2013 WL 5964480 (W.D.N.Y. 2013) ...............................................................14

*Alaska Airlines, Inc. v. Sweat*,
  568 P.2d 916 (Alaska 1977)...........................................................................25

*American Airlines, Inc. v. Wolens*,
  513 U.S. 219 (1995)...............................................................................14, 21

*Arizona v. United States*,
  567 U.S. 387 (2012).................................................................................3, 5, 6

*Bargmann v. Helms*,
  715 F.2d 638 (D.C. Cir. 1983)...........................................................................5

*Becker v. Avco Corp.*,
  387 P.3d 1066 (Wash. 2017).............................................................................11

*Bradshaw v. Am. Airlines, Inc.*,
  123 F.4th 1168 (10th Cir. 2024) ...........................................................7, 10, 11

*Burbank v. Lockheed Air Terminal Inc.*,
  411 U.S. 624 (1973)...........................................................................2, 3, 6, 9, 13

*Charas v. Trans World Airlines, Inc.*,
  160 F.3d 1259 (9th Cir. 1998) (en banc) .......................................................18, 20

*Davidson v. Fairchild Controls Corp.*,
  2016 WL 5539982 (S.D. Tex. 2016) ...............................................................11

*Elassaad v. Indep. Air, Inc.*,
  613 F.3d 119 (3d Cir. 2010)...........................................................................11

*Freese v. Continental Airlines, Inc.*,
  2009 WL 2232857 (N.D. Ohio 2009)...........................................................22, 24

*French v. Pan Am Exp., Inc.*,
  869 F.2d 1 (1st Cir. 1989)...........................................................................5, 11

*Geier v. Am. Honda Motor Co.*,
  529 U.S. 861 (2000)...............................................................................8, 12

*Gilstrap v. United Air Lines, Inc.*,
  709 F.3d 995 (9th Cir. 2013) ...........................................................................7

---

[*]    Authorities marked with an asterisk are those on which we chiefly rely.

**Cases—continued**

*Greene v. B.F. Goodrich Avionics Sys., Inc.*,
    409 F.3d 784 (6th Cir. 2005) ........................................................10, 11

*Haley v. United Airlines Inc.*,
    2015 WL 5139638 (N.D. Ill. 2015) ...............................................24, 25

*Hart v. Delta Air Lines, Inc.*,
    2018 WL 1087846 (C.D. Cal. 2018)...............................................22, 24

*Martin ex rel. Heckman v. Midwest Exp. Holdings, Inc.*,
    555 F.3d 806 (9th Cir. 2009) ....................................................10, 11, 12

*Hodges v. Delta Airlines, Inc.*,
    44 F.3d 334 (5th Cir. 1995) .....................................................18, 20, 21

*Kelley v. United Airlines, Inc.*,
    986 F. Supp. 684 (D. Mass. 1997) ........................................................25

*Magee v. Am. Inst. of Certified Pub. Accts.*,
    245 F. Supp. 3d 106 (D.D.C. 2017) ......................................................21

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996)..................................................................................4

*Momen v. United States*,
    946 F. Supp. 196 (N.D.N.Y. 1996).......................................................24

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992)...........................................................................19, 20

*Nw., Inc. v. Ginsberg*,
    572 U.S. 273 (2014)..............................................................................6, 18

*PLIVA, Inc. v. Mensing*,
    564 U.S. 604 (2011)............................................................................17, 18

*Quaid v. Kerry*,
    161 F. Supp. 3d 70 (D.D.C. 2016) ........................................................23

*Ray v. Atl. Richfield Co.*,
    435 U.S. 151 (1978)...................................................................................6

*Rice v. Santa Fe Elevator Corp.*,
    331 U.S. 218 (1947)...................................................................................6

*Schneidewind v. ANR Pipeline Co.*,
    485 U.S. 293 (1988)......................................................................2, 3, 5, 6

*Sebastian v. D.C.*,
    636 A.2d 958 (D.C. 1994) .....................................................................25

*Shaw v. Delta Airlines, Inc.*,
    798 F. Supp. 1453 (D. Nev. 1992) ........................................................24

**Cases—continued**

*Sikkelee v. Precision Airmotive Corp.,*
   822 F.3d 680 (3d Cir. 2016) (*Sikkelee I*) ...............................................3, 10, 11, 12

*Sikkelee v. Precision Airmotive Corp.,*
   907 F.3d 701 (3d. Cir. 2018) (*Sikkelee II*) ...................................................17, 18

*Silkwood v. Kerr-McGee Corp.,*
   464 U.S. 238 (1984)...........................................................................................17, 18

*\*Tweed-New Haven Airport Auth. v. Tong,*
   930 F.3d 65 (2d Cir. 2019)........................................................................................11

*United Parcel Serv., Inc. v. Flores-Galarza,*
   318 F.3d 323 (1st Cir. 2003) ......................................................................................3

*United States v. Locke,*
   529 U.S. 89 (2000)............................................................................................3, 4, 5

*United States v. Price,*
   361 U.S. 304 (1960).....................................................................................................6

*\*US Airways, Inc. v. O'Donnell,*
   627 F.3d 1318 (10th Cir. 2010) .................................................................................3

*Ventress v. Japan Airlines,*
   747 F.3d 716 (9th Cir. 2014) ...................................................................................11

*\*Witty v. Delta Air Lines, Inc.,*
   366 F.3d 380 (5th Cir. 2004) ...................................................................................11

*Wyeth v. Levine,*
   555 U.S. 555 (2009).................................................................................................3, 8

**Statutes**

49 U.S.C.
   § 40101 note...............................................................................................................8
   § 40103(b)...................................................................................................................4
   § 40120(c)................................................................................................................7, 8
   § 41112........................................................................................................................7
   § 41712(c).................................................................................................................24
   § 41713........................................................................................................................6
   § 41713(b)(1)..............................................................................................7, 18, 19
   § 44701(b)...................................................................................................................6
   § 44701(c)............................................................................................................4, 6, 9
   § 44701(d)(1)(A)........................................................................................................6
   § 45106(a).................................................................................................................12

Airline Deregulation Act of 1978, Pub. L. No. 95-504, 92 Stat. 1705 ........................6

Airline Safety and Federal Aviation Administration Extension Act of 2010, Pub.
   L. No. 111-216 § 210 (2010) ...................................................................................24

Federal Aviation Act of 1958, Pub. L. No. 85-726, 72 Stat. 731 ............................4, 9

**Statutes—continued**

General Aviation Revitalization Act of 1994, Pub. L. No. 103-298, 108 Stat. 1552
(1994) ...............................................................................................................8

**Regulations**

14 C.F.R.

Part 5 ...........................................................................................................15
§ 5.1 ............................................................................................................16
§ 5.7 ............................................................................................................16
§ 5.53 ..........................................................................................................15
Part 25 .........................................................................................................14
§ 25.1395 .....................................................................................................17
§ 25.1401 .....................................................................................................15
§ 91.17 .........................................................................................................12
§ 91.101 .........................................................................................................5
§ 91.161 .......................................................................................................14
Part 93 Subparts K & S ...............................................................................16
§ 93.123 .......................................................................................................16
§ 93.125 .......................................................................................................16
Part 121 Subpart G ......................................................................................13
§ 121.401(a)(1) ............................................................................................14
§ 121.533(a) .........................................................................................13, 14, 17, 23
§ 125.91(a) ..................................................................................................15
§ 257.5(c) ....................................................................................................24

**Other Authorities**

FAA, *FAA Revokes AMI Jet Charter's Certificate* (Oct. 31, 2007) ...............17

FAA Order 8040.4C ........................................................................................16

H.R. Rep. No. 85-2360 (1958) .........................................................................4

Restatement (Second) of Torts § 324A .........................................................22

Restatement (Third) of Agency § 2.03 ..........................................................23

S. Rep. No. 85-1811 ..........................................................................................4

U.S. Amicus Br., *Avco Corp. v. Sikkelee*, No. 18-1140,
2019 WL 6726852 (U.S. Dec. 9, 2019) .......................................................11

**INTRODUCTION**

The United States agrees it has exclusively regulated air travel since inception because "it would be untenable for 50 states to impose their own rules on national and international airlines." U.S. Br. (Dkt. 68) at 1. Airlines could not operate—certainly not safely or efficiently—if individual states could require them to act other than according to uniform federal standards; with the rulebook changing by the minute in-flight, pilot training and flight operations would become impossible. The Supreme Court and seven circuits have thus recognized that, in enacting the Federal Aviation Act, Congress intended federal law to set the standard of care for tort claims sounding in aviation safety—not the law of the eight states and D.C. over which Flight 5342 flew. When an airline violates federal standards, injured parties may seek a remedy. But Plaintiffs failed to allege that American violated any aspect of federal aviation safety law. Indeed, Plaintiffs do not seriously dispute this point. Claims against American should thus be dismissed.

Plaintiffs contend that any preempted field is narrow and that conflict preemption, rather than field preemption, controls the analysis. Plaintiffs are mistaken: Their narrow view of preemption cannot be squared with Congress's objective to set uniform rules to achieve aviation safety. But even on Plaintiffs' view, their claims still fail. Their claims all fall within the preempted field, even if narrowly understood. Federal law comprehensively regulates all of American's conduct that Plaintiffs criticize—from training to lighting to safety risk management to flight scheduling. Plaintiffs cannot use general state tort principles to revise American's federal duties but must allege American violated an applicable *federal* standard—they concededly have not. Further, Plaintiffs' claims conflict and interfere with that same comprehensive set of federal regulations.

In addition to field and conflict preemption, the Airline Deregulation Act (ADA) expressly preempts Plaintiffs' scheduling claims. The United States agrees. U.S. Br. 1.

To be clear, preemption here applies to the duty of care—not to the existence of a remedy. When an entity *does* violate federal standards, it may be liable. That is the case for the United

States—which has acknowledged violating multiple federal aviation safety obligations.  While Plaintiffs' claims may not proceed against American, they will continue as to the United States.

## ARGUMENT

### A.    Federal law preempts state standards of care, and Plaintiffs have not alleged that American violated a federal standard of care.

American explained (at 21-22) that Plaintiffs have failed to allege that American violated a single federal aviation safety standard or regulation, an allegation necessary to state a claim related to aviation safety.  Plaintiffs do not dispute that their complaint is lacking in this respect as to American; they argue that they can disregard the federal regulatory scheme governing each of the safety topics their claims address and instead allege generalized state standards of care.  But Plaintiffs offer no authority to undermine the obvious fact that, in enacting the Federal Aviation Act, Congress necessarily intended the FAA to develop "a uniform and exclusive system of federal regulation if [its] objectives underlying the … Act are to be fulfilled."  *Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 639 (1973).  Nor does Plaintiffs' heavy reliance on products liability cases undermine the circuits' overwhelming recognition that Congress's exclusive regulation of the field of aviation safety preempts state standards of care.  Plaintiffs' inability to allege that American violated any federal standard requires dismissal.

Even under Plaintiffs' preemption theory, which would constrict the relevant preempted field and otherwise apply conflict preemption, their claims still fail.  Each claim directly concerns safety-related aspects of flight that federal law "pervasive[ly]" regulates and where the federal interest in uniform regulation "is … dominant."  *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300 (1988).  Thus, no matter how narrowly the field is defined, it encompasses Plaintiffs' claims.

And as American showed (at 26-27, 28, 31)—though not necessary to establish preemption—Plaintiffs' claims *do* conflict with federal law.  Plaintiffs do not respond.

In short, Plaintiffs' claims against American are preempted under any analysis.

### 1.    *Congress intended federal law to occupy the field of aviation safety.*

The consensus among courts is that Congress occupied the field of aviation safety via the Federal Aviation Act. *See* Am. Mot. 16-22. Plaintiffs' arguments to the contrary miss the mark.

**a.** Plaintiffs cannot invoke a presumption against preemption. Dkt. 66 (Opp.) 16. That presumption applies where "Congress has legislated in a field which the States have traditionally occupied." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (alterations adopted). The Supreme Court has conversely held that "an 'assumption' of nonpre-emption is not triggered when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108 (2000) (presumption did not apply to field of tanker-ship operations and design because "Congress ha[d] legislated … from the earliest days of the Republic" in the field of "maritime commerce"); *see also Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341, 347-348 (2001) ("Policing fraud against federal agencies is hardly 'a field which the States have traditionally occupied,' such as to warrant a presumption against finding federal pre-emption.").

As American demonstrated (at 2-3, 16-17), Congress has exclusively regulated air travel since its inception because it uniquely requires federal control. *See* U.S. Br. 1 ("[I]t would be untenable for 50 states to impose their own rules."). Where an area has not been traditionally occupied by the states but by the federal government "from the earliest days," the Supreme Court has not hesitated to find preemption. *Locke*, 529 U.S. at 108; *see, e.g.*, *Schneidewind*, 485 U.S. at 299-300; *Arizona v. United States*, 567 U.S. 387, 399 (2012); *Burbank*, 411 U.S. at 633-634. The First and Tenth Circuits have reached this precise conclusion, holding that "the field of aviation safety has long been dominated by federal interests," and so "the presumption against preemption does not apply." *US Airways, Inc. v. O'Donnell*, 627 F.3d 1318, 1325 (10th Cir. 2010); *see United Parcel Serv., Inc. v. Flores-Galarza*, 318 F.3d 323, 336 (1st Cir. 2003).

Plaintiffs disregard these cases and cite (at 17) just one authority relying on this presumption in the aviation context, *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680 (3d Cir. 2016)

(*Sikkelee I*).  But *Sikkelee I* focused on the claims before it—products liability claims against a manufacturer; it observed that "products liability claims are exemplars of traditional state law causes of action" and that "state law governed the earliest products liability claims in this country." *Id.* at 690.  Because this is not a products liability case, those concerns do not apply here.[2]

**b.**  As Plaintiffs acknowledge (at 12), the "ultimate touchstone" in the preemption inquiry is Congress's intent.  *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).  Congress's intent to occupy the field of aviation safety regulation in the Federal Aviation Act could not be clearer.

American explained (at 16-19) that in enacting the Federal Aviation Act, Congress vested "full responsibility and authority" in the FAA for "the promulgation and enforcement of safety regulations" (H.R. Rep. No. 85-2360) "to provide for the safe and efficient use of the airspace by both civil and military aircraft" (Pub. L. No. 85-726, 72 Stat. 731, 49 U.S.C. § 1301 *et seq.*).  It recognized that, because aviation "operations are conducted almost wholly within the Federal jurisdiction," "the Federal Government bears virtually complete responsibility for the … supervision of this industry."  S. Rep. No. 85-1811 at 5.  So it charged the FAA Administrator with overseeing virtually every aspect of aviation safety—directing the Administrator "to prescribe air traffic rules and regulations governing the flight of aircraft, for the … protection … of aircraft, … and for the efficient utilization of the navigable airspace, including … rules for the prevention of collision between aircraft."  72 Stat. at 750, *codified at* 49 U.S.C. § 40103(b); *see also* 49 U.S.C. § 44701(c).

The breadth and comprehensive nature of that statutory text is reflected in the FAA's pervasive regulatory scheme, which spans hundreds of pages in the Code of Federal Regulations and

---

[2]    Plaintiffs contend (at 16) that a presumption against preemption should apply because common law liability has long been a component of states' power to protect health and safety, but that misunderstands the inquiry.  The question is whether the field regulated by the federal government (here, aviation safety) has traditionally been occupied by the states.  *Locke*, 529 U.S. at 108 (presumption is triggered when "the field which Congress is said to have pre-empted has been traditionally occupied by the States").  Plaintiffs do not and cannot contend that states have traditionally set the standard of care for aviation, which has been federally controlled since its inception.

touches upon each aspect of Plaintiffs' safety-related claims, including air traffic control by federal employees (14 C.F.R. § 91.101 *et seq.*), instruments and safety equipment on commercial aircraft (*id.* §§ 121.301-359), flight crew training (*id.* §§ 121.400-429) and certification (*e.g.*, *id.* § 61 *et seq.*), airline safety risk management systems (*id.* §§ 5.1-5.97), and flight scheduling at high-density airports like DCA (*id.* §§ 93.121-93.133, 93.211-227).

Congress thus "has determined" that aviation safety "must be regulated by its exclusive governance," which it delegated to the FAA in the Act. *Arizona*, 567 U.S. at 399. By assigning the FAA "comprehensive responsibility over the safety of air travel" (U.S. Br. 4), the Act shows Congress's intent to make those standards a "field reserved for federal regulation." *Locke*, 529 U.S. at 111; *see Bargmann v. Helms*, 715 F.2d 638, 642 (D.C. Cir. 1983) (describing Congress's "evident intent … to give the FAA *plenary authority* to make and enforce safety regulations governing the design and operation of civil aircraft" and finding that Congress "intended comprehensiveness"). Contrary to Plaintiffs' suggestion (at 14), this conclusion can be inferred from the Act itself—that FAA has undertaken its statutory mandate to comprehensively regulate the specific areas concerning Plaintiffs' claims only reinforces the conclusion that Plaintiffs must allege a violation of a federal standard to state a claim. As the government explains (at 3-4), there are "obvious problems that would arise if the 50 states and the FAA attempted to regulate air safety at the same time," and this "principle of federal uniformity has teeth here." *See French v. Pan Am Exp., Inc.*, 869 F.2d 1, 6 (1st Cir. 1989). Because the FAA has exercised this authority to promulgate a pervasive scheme of regulation "uniquely suited to promote national aviation standardization," these regulations "have a general and practical preemptive effect." U.S. Br. 3. "[T]he pervasiveness of the federal regulation" pursuant to the Federal Aviation Act "precludes supplementation by the States." *Schneidewind*, 485 U.S. at 301.

Plaintiffs raise (at 13-16, 17-18) two principal textual points, neither of which refutes this

analysis.[3]  *First*, Plaintiffs' observation that the Federal Aviation Act "contains no express preemption provision" does not undermine Congress's intent to vest the FAA with exclusive authority to regulate aviation safety.  Opp. 13.  The Supreme Court has repeatedly found that Congress intended to occupy a field without an express statement.  *E.g.*, S*chneidewind*, 485 U.S. at 300-304; *Arizona*, 567 U.S. at 400-402; *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230-236 (1947).

The same goes for Plaintiffs' observation (at 15) that, decades later, Congress included an express preemption provision when it enacted the ADA.  *See infra* at 18-21; 49 U.S.C. § 41713. As American described (at 31-32), Congress enacted the ADA to achieve a distinctly economic aim, and it included an express preemption provision to "prevent the States from undoing what the Act was meant to accomplish" (*Nw., Inc. v. Ginsberg*, 572 U.S. 273, 283 (2014)), allowing "maximum reliance on competitive market forces" to further the "variety [and] quality … of air transportation services" (92 Stat. 1705, 1706-1707).  This legislative aim—intentional deregulation of a field—is distinct from Congress's objective when it enacted the Federal Aviation Act, through which it comprehensively regulated aviation safety according to uniform federal rules; there is thus no negative inference to be drawn from Congress's inclusion of an express preemption provision in the ADA.  *See United States v. Price*, 361 U.S. 304, 332 (1960) ("[T]he views of a

---

[3]    Plaintiffs observe without elaboration that the Federal Aviation Act authorizes the FAA to issue "minimum safety standards."  Opp. 14 (citing 49 U.S.C. § 44701(b)).  That text speaks directly to the Administrator's obligation to ensure baseline safety in air travel—not a congressional invitation for more than fifty sovereigns to regulate safety in federal airspace.  *See Ray v. Atl. Richfield Co.*, 435 U.S. 151, 168 n.19 (1978) ("We are unconvinced that because [the statute] speaks of the establishment of comprehensive 'minimum standards' [it] requires recognition of state authority to impose higher standards than the Secretary has prescribed.").  What matters is whether "it is sufficiently clear that Congress directed the promulgation of standards on the national level."  *Id.*  The Supreme Court has already held that Congress intended the Act to create "a uniform and exclusive system of federal regulation."  *Burbank*, 411 U.S. at 638-639.  Federal aviation safety law is not a floor atop which states can erect their own standards.  Instead, federal standards optimize safety; the standards must "consider the duty of an air carrier to provide service with the *highest possible degree of safety in the public interest*" (49 U.S.C. § 44701(d)(1)(A) (emphasis added)), and the Administrator must "carry out this chapter in a way that best tends to reduce or eliminate the possibility or recurrence of accidents in air transportation" (*id.* § 44701(c)).

subsequent Congress form a hazardous basis for inferring the intent of an earlier one.").[4]

*Second*, Plaintiffs' reliance on the Act's saving clause (at 13) and the General Aviation Revitalization Act (GARA) (at 15-16) conflate safety standards and injury remedies. As American explained (at 21-22), the text of the Act's saving clause preserves state "remedies"—it says nothing about state standards of care. 49 U.S.C. § 40120(c). As many courts have held, far from expressing an intent to preserve state standards of care, this targeted text shows the opposite: Congress wanted to preserve state causes of action in tort, but only for "violation of *federal* air safety standards." *Abdullah v. Am. Airlines*, Inc., 181 F.3d 363, 376 (3d Cir. 1999) (emphasis added); *see also, e.g.*, *Bradshaw v. Am. Airlines, Inc.*, 123 F.4th 1168, 1176-1178 (10th Cir. 2024) (synthesizing cases reaching this conclusion); *Gilstrap v. United Air Lines, Inc.*, 709 F.3d 995, 1006 (9th Cir. 2013) ("adopt[ing] *Abdullah*'s division of the FAA's field preemptive effect").

The saving clause simply preserves the state law causes of action Plaintiffs use as a remedy mechanism; a violation of a federal standard of care, however, is still required. *E.g.*, *Bradshaw*, 123 F.4th at 1178 ("Passengers retain their ability to pursue negligence damages under Oklahoma common law, with the federal standard of care preempting Oklahoma's."). As evidenced by Congress's inclusion of a liability-insurance requirement (49 U.S.C. § 41112), there is no question that Congress contemplated the availability of personal injury suits for passengers injured because of violations of federal air safety standards. But because the Act contains no federal cause of action for such suits, the saving clause preserves those state mechanisms for recourse.

For this reason, Plaintiffs' reliance on GARA's preemption clause is also misplaced—that express preemption is necessary because of the Federal Aviation Act's preservation of state-law

---

[4]  Notably, the ADA's express preemption provision bars states from "enforc[ing]" any law "related to a price, route, or service," which, coupled with the absence of a federal cause of action, prohibits state tort claims altogether. 49 U.S.C. § 41713(b)(1). Congress could not have intended this provision to define the scope of aviation preemption where it elsewhere evidenced intent to preserve remedies for personal injury suits. ADA express preemption ensures economic deregulation, while airlines may still be liable for violating *federal* aviation safety standards.

remedies. Pub. L. No. 103-298 (1994), *reprinted in* 49 U.S.C. § 40101 note. GARA "establish[es] time limitations on certain civil actions against aircraft manufacturers." *Id.* Because the Federal Aviation Act preserves state causes of action (49 U.S.C. § 40120(c)), Congress had to specify in GARA that state law is preempted "to the extent that such law permits a civil action" against an aircraft manufacturer beyond the newly established limitations period. This targeted provision in no way reflects Congress's intent to silently cede exclusive regulation over aviation safety.

Even if these provisions were meaningful to the analysis (they are not), their existence does not "create some kind of special burden beyond that inherent in ordinary pre-emption principles." *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 870 (2000) (quotations omitted). Plaintiffs rely heavily (at 13, 16, 17, 19, 20) on *Wyeth v. Levine*, 555 U.S. 555 (2009), and cobble together various dissents and concurrences from Justices Scalia and Thomas (at 18-19) in arguing that these provisions count as "strikes against inferring congressional intent to preempt the field of aviation safety." Opp. 17. But Plaintiffs' reliance is—at best—misplaced because *Wyeth* is a conflict-preemption case. Wyeth, a drug manufacturer, "abandoned" its "field pre-emption argument," so the Court only considered whether "it was impossible for it to comply with both federal and state requirements" or whether state tort claims would "obstruct the purposes and objectives of federal drug labeling regulation." 555 U.S. at 560, 573. The Court's consideration of the express preemption provision there, moreover, was in a meaningfully different context. Congress had enacted "an express pre-emption provision for medical devices" but not "for prescription drugs," even though it was "certain[ly] aware[]" of the prevalence of state tort litigation" regarding the safety of drugs. *Id.* at 574-575. That is nothing like the statutory history or context here, where Congress enacted the express preemption provisions in the ADA and GARA because they were necessary to achieve the particular objectives of those statutes, distinct from the Federal Aviation Act's aim of ensuring uniform aviation safety standards.

In enacting the Federal Aviation Act, Congress recognized that it *had* to entirely displace

all other regulations to maximize aviation safety within federal airspace.  Regulating aviation is unique given the multi-jurisdictional nature of air travel—as Congress recognized, there is no way to practically achieve aviation safety without "a uniform and exclusive system of federal regulation." *Burbank*, 411 U.S. at 639.  The statutory text manifests this common-sense observation and shows that Congress intended to occupy the field of aviation safety regulation.  *See* Pub. L. No. 85-726, 72 Stat. 731, 744, 749-750; 49 U.S.C. § 44701(c).

    **c.**  It is thus unsurprising that the Supreme Court and seven circuits have recognized the broad preemptive scope of federal regulation in matters of aviation safety.  Am. Mot. 19-21.

    To start, the Supreme Court has held that the federal government's regulation of aviation safety impliedly preempted local noise restrictions limiting takeoffs at certain hours.  *Burbank*, 411 U.S. at 633-634.  Plaintiffs argue (at 18-19) that *Burbank* concerned only the "federal regulation of aircraft noise," but that disregards the Court's reasoning.  Although the Court stated that "[i]t is the pervasive nature of the scheme of federal regulation of aircraft noise that leads us to conclude that there is pre-emption" (411 U.S. at 633), it then explained that the "interdependence" between noise regulations and the Federal Aviation Act's regulation of "safety" "requires a uniform and exclusive system of federal regulation" to achieve the Federal Aviation Act's "objectives" (*id.* at 639).  If the local noise ordinances were not preempted, "fractionalized control of the timing of takeoffs and landings would severely limit the flexibility of FAA in controlling air traffic flow"—as regulated under the Federal Aviation Act—causing a "decrease in safety."  *Id.*  Viewed in full, the Court's analysis shows that it determined that federal regulation of aviation safety dominated and occupied the field.  Plaintiffs try to minimize the relevance of *Burbank* because it "did not involve tort claims," but that is a distinction without a difference.  *Burbank*'s reasoning—that Congress enacted "a uniform and exclusive system of federal regulation" to achieve "safety"—is instructive, as is its holding that state-law regulation even of a purely local nuisance concern like noise is preempted.  *Id.* at 638-639.

Seven courts of appeals agree with the Supreme Court that "Congress intended the [FAA] to exercise sole discretion in regulating air safety" and have expressly held that "federal law establishes the applicable standards of care in the field of air safety, generally, thus preempting the entire field from state and territorial regulation." *Abdullah*, 181 F.3d at 367, 369; *see* Am. Mot. 19-20 (collecting cases). Against this weight of authority, Plaintiffs try to recharacterize these cases (at 21-31) to stand for a narrower field preemption—that of "in-flight operations"—and they point (at 18) to an outlier circuit that has not squarely addressed the field preemption question. Neither argument, however, undercuts the weight of circuit authority in American's favor.

While Plaintiffs argue that American "[o]ver-[r]ead[s] *Abdullah*" and instead focus on the Third Circuit's subsequent products liability case, *Sikkelee I*, it is Plaintiffs who place far more weight on *Sikkelee I* than it can bear. Opp. 24-25. The Third Circuit held in *Sikkelee I* that "Congress has not created a federal standard of care for *persons injured by defective airplanes*," and thus "the Federal Aviation Act and its implementing regulations do not indicate … intent to preempt state law products liability claims." 822 F.3d at 696 (emphasis added). This decision simply recognizes, as other circuits have, that products liability claims are distinct from other negligence claims relating to aviation safety, which must be assessed using federal standards of care. *See, e.g.*, *Martin ex rel. Heckman v. Midwest Exp. Holdings, Inc.*, 555 F.3d 806, 808-811 (9th Cir. 2009) (distinguishing claim that airplane stairs were defective from the preempted "field of aviation safety"); *Greene v. B.F. Goodrich Avionics Sys., Inc.*, 409 F.3d 784, 788-789, 794-795 (6th Cir. 2005) (adopting *Abdullah* yet applying state law to design defect claim); *Bradshaw*, 123 F.4th at 1174-1176 (explaining this distinction). For one, because the necessity of uniform regulation is less pronounced in the products liability context, there is no "comprehensive system of rules and regulations" governing the manufacturing of airplanes as there is "to promote in-flight safety 'by regulating pilot certification, pilot pre-flight duties, pilot flight responsibilities, and flight rules.'" *Sikkelee I*, 822 F.3d at 694 (quoting *Abdullah*, 181 F.3d at 369). Two, the court relied extensively

10

on GARA, which, "[b]y barring products liability suits against manufacturers of … older aircraft parts, … necessarily implies that such suits were and are otherwise permitted." *Id.* at 696. The court did not overrule *Abdullah* but recognized, as the Sixth, Ninth, and Tenth Circuits have, that while "the Federal Aviation Act preempts state law standards of care in the field of aviation safety, … products liability does not fall within that preempted field." *Sikkelee I*, 822 F.3d at 689 (citing *Martin*, 555 F.3d at 809-811).[5]

Under this correct understanding of *Sikkelee I*, Plaintiffs' attempt to characterize the circuit law as centered around *Sikkelee I*'s framework and limiting field preemption to "in-air operations" (Opp. 21-31) is simply incorrect. Although *Sikkelee I* excludes product-liability claims from the field of aviation safety, no circuit holds the preempted field limited to in-air operations; they recognize that to achieve "in-air safety," Congress intended exclusive federal regulation over a host of matters requiring uniform standards, including "requirements for aircraft parts" like lighting, "flight rules," "qualifications for [crewmembers]," and aircraft "altitude, communications, and flight path," all of which are "associated with flight" and aimed to "prevent[] … accidents." *Elassaad v. Indep. Air, Inc.*, 613 F.3d 119, 128-129 (3d Cir. 2010); *Tweed*, 930 F.3d at 75 (regulation of runway length preempted); *French*, 869 F.2d at 6 (pilot regulation preempted as "related to air safety"); *Ventress v. Japan Airlines*, 747 F.3d 716, 722 (9th Cir. 2014) (same); *Witty v. Delta Air Lines, Inc.*, 366 F.3d 380, 386 (5th Cir. 2004) (safety warnings to passengers preempted); *Greene*,

---

[5]    Plaintiffs describe *Sikkelee I*'s analysis as "highly influential" (Opp. 21), but the state court and district court cases they cite are both also products liability cases. *See Becker v. Avco Corp.*, 387 P.3d 1066 (Wash. 2017); *Davidson v. Fairchild Controls Corp.*, 2016 WL 5539982 (S.D. Tex. 2016). The circuits that have since considered aviation preemption have maintained that the field of aviation safety is preempted outside the products liability context, declining to cite *Sikkelee I* and in one case favorably relying on *Abdullah*. *See Bradshaw*, 123 F.4th at 1178 ("[W]e agree with *O'Donnell*'s favorable citation of *Abdullah* and agree with that court's reasoning."); *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 75 (2d Cir. 2019) ("Congress intended the [Federal Aviation Act] to occupy the entire field of air safety including runway length."). And for its part, the government has argued that *Sikkelee I* was wrongly decided because aircraft design is "within a 'field' that Congress 'has reserved for federal regulation.'" U.S. Amicus Br., *Avco Corp. v. Sikkelee*, No. 18-1140, 2019 WL 6726852, *12 (U.S. Dec. 9, 2019) (citation omitted).

409 F.3d at 795 (same); *Montalvo*, 508 F.3d at 473-474 (same).  None of these holdings limit the Federal Aviation Act's field preemptive force solely to flight operations.

Plaintiffs also point to the Eleventh Circuit (at 18), but its cases are not instructive here. *Public Health Trust of Dade County v. Lake Aircraft, Inc.* held that a defective seat design claim was not preempted, relying principally upon the express preemption provision in the Airline Deregulation Act.  992 F.2d 291, 293-295 (11th Cir. 1993).  As explained *supra* (at 6-8), reliance on the ADA's express preemption provision is not "helpful on the issue of federal preemption of aviation safety standards" because "safety of an airline's operations would not appear to fall within the ambit of the ADA and its procompetition preemption clause." *Abdullah*, 181 F.3d at 373 (rejecting Eleventh Circuit's analysis in *Public Health*).  As *Public Health* offers little other analysis on field preemption, it is unsurprising that no other circuit has adopted it; rather, they treat *Public Health* as addressing—like *Sikkelee I*—the unique context of "defective product claims." *Martin*, 555 F.3d at 809; *see also Sikkelee I*, 822 F.3d at 706 & n.23 (noting that *Public Health*'s analysis and "broader holding[] is now in doubt" in light of "more recent Supreme Court authority" on preemption, *Geier*).

Nor is *Hughes v. Attorney General of Florida*, which concerned a pre-trial habeas petition of "two airline pilots charged … with violating Florida criminal statutes prohibiting the operation of an aircraft while intoxicated," helpful to Plaintiffs.  377 F.3d 1258, 1260 (11th Cir. 2004).  In that unique posture, the Eleventh Circuit determined that the preemption claims were "not facially conclusive," so it "abstained from deciding the preemption claims at this time." *Id.* at 1266.  Central to its conclusion, however, was the existence of a federal statute and regulation which contain "explicit statement[s]" that "contemplate the operation of state laws making the piloting of an airplane while intoxicated illegal." *Id.* at 1267; *see* 49 U.S.C. § 45106(a); 14 C.F.R. § 91.17(a).[6]

---

[6]    The court also did not reject *Abdullah*'s reasoning; it concluded that it was not "facially conclusive … that Florida's law with respect to criminal responsibility does not bear some similarity

In sum, the overwhelming authority is clear:  In enacting the Federal Aviation Act, Congress intended federal law to "exclusive[ly]" occupy the field of aviation safety, which must be "uniform … if the congressional objectives underlying the [Act] are to be fulfilled." *Burbank*, 411 U.S. at 638-639.  Because Plaintiffs' claims all directly concern matters of aviation safety in which federal law dominates, violation of a federal standard is necessary to state a claim.

### 2. *Plaintiffs effectively concede that they have not alleged that American violated a federal standard.*

Although Plaintiffs' claims all directly implicate areas of aviation safety that federal law pervasively regulates, Plaintiffs all but admit that they have not alleged that American breached any one of those applicable standards.  They only point (at 31) to their citations that "the AE 5342 pilots violated" two federal regulations, but the flight-operation claims do not implicate American, which did not operate Flight 5342.  *See* Am. Mot. at 24-25; 14 C.F.R. § 121.533(a) ("Each certificate holder conducting domestic operations is responsible for operational control.").

Recognizing such allegations are lacking against American, Plaintiffs instead argue they need no such allegation because their claims are "outside the 'field' of in-flight operations."  Opp. 34.  But even under Plaintiffs' "functional" formulation of field preemption *(id*. at 21), which would ask whether federal law pervasively regulates the issues in each specific claim (*id*. at 20), their claims are preempted.  Plaintiffs acknowledge that "federal aviation regulations impose certain duties" on airlines regarding each of their claims.  *Id*. at 34.  That ends the analysis.

### a. *Training, instruction, and supervision.*

Despite acknowledging (Opp. 35-36) that entire subparts in the Code of Federal Regulations govern an airline's flight manual (14 C.F.R. Part 121 Subpart G) and crewmember training (*id.* Subpart N), Plaintiffs make no allegation that American violated these federal standards in failing to require PSA to adopt certain policies and procedures regarding pilot training.  The

---

to the state damage remedy which was permitted in *Abdullah*."  *Id.* at 1271; *see also id.* at 1270 ("[I]t is not at all clear that the state action at issue here encroaches upon any need for uniformity.").

regulations governing crewmember training are extensive and comprehensive, even detailing spe-cific training requirements for pilots flying under Visual Flight Rules near DCA (14 C.F.R. § 91.161). Am. Mot. 4-5, 26. They specifically require that crew members are qualified in re-sponding to alerts of potential collision risks, and they require that the flight manual "contain[s] appropriate procedures for" the use of those alert systems and "[p]roper flight crew reaction." *Id.* § 121.354. Plaintiffs do not allege that American breached any of these "exhaustive" federal standards governing "pilot training." *In re Air Crash Near Clarence Ctr.*, 2013 WL 5964480, *5 (W.D.N.Y. 2013).[7]

Plaintiffs also disregard that federal law requires "each certificate holder" to "obtain initial and final FAA approval of the training program" "[p]rior to implementation," as well as approval for any revision to a training program. 14 C.F.R. § 121.401(a)(1); *id.* § 121.405. Plaintiffs argue that PSA could simply "change its policy and the FAA would have approved that change," but to the extent that is even relevant or accurate, such allegations are absent from the complaint. Opp. 35. And they would not change the analysis anyway. Plaintiffs do not allege that *American* vio-lated a federal standard by not changing *PSA's* training or procedures; to the contrary, federal law makes clear that American cannot exert such control over another air carrier. *E.g.*, 14 C.F.R. §§ 121.401(a)(1), 121.533(a). Nor can state laws dictate when airlines must make (and, by logical extension, the FAA would have had to approve) changes to training. *See infra* at 16-18. Plaintiffs' argument only underscores the pervasive federal involvement in this field.

### b. *Aircraft lighting*

Federal regulations comprehensively address the specifics of an aircraft's exterior lighting (14 C.F.R. §§ 25.1381-25.1403) with minimum and maximum light intensities in all exterior

---

[7]    Contrary to Plaintiffs' suggestion (at 36-37), *Sikkelee I* has little relevance to *In re Air Crash Near Clarence Center*'s holding that pervasive federal regulation of pilot training and certification preempts state standards of care. Plaintiffs' effort to analogize to product-liability cases by de-scribing contents of a flight manual as its "design" (Opp. 34-36) is inapt. *See* PSA Reply 6.

lighting (*id.* §§ 25.1391-25.1395), color specifications (*id.* § 25.1397), and technical specifications for an "anticollision light system" (*id.* § 25.1401).  It is difficult to fathom how the FAA could have more pervasively regulated this feature, in which uniformity is crucial to optimize safety.

Despite this extensive regulation governing this exact topic, Plaintiffs do not allege that American or PSA breached any federal standard, so the claim—as the United States agrees—"is preempted." U.S. Br. 4.  Plaintiffs' allegations that LED lights "would have been brighter" (*e.g.*, Compl. ¶ 208(i)) are legally irrelevant without an accompanying allegation that the lighting on Flight 5342's aircraft did not meet the federal minimum intensities required for an anticollision light system.  *See* 14 C.F.R. § 25.1401(e)-(f).  There is no such allegation.[8]

### c.    *Safety risk management*

Federal law comprehensively dictates airlines' safety risk management programs.  *See* 14 C.F.R. Part 5.  Plaintiffs are wrong that these regulations simply "ensure that such a program exists" (Opp. 37)—to the contrary, federal law sets standards for, among other things, the "information [that] must be considered" "to identify hazards" (14 C.F.R. § 5.53), contents of a safety policy (*id.* § 5.21), "processes" required "to acquire data with respect to its operations, products, and services to monitor the safety performance" (*id.* § 5.71), and "training … to ensure … individuals attain and maintain the competencies necessary to perform their duties relevant to the operation and performance of the [safety management system]" (*id.* § 5.91).

Plaintiffs do not allege that American breached any one of these many federal standards.  Finding preemption here, moreover, does not "immunize airlines from liability for conducting

---

[8]    *Sikkelee I* does not undermine preemption here.  *See* Opp. 38.  First, *Sikkelee I* concerned a *manufacturer*'s obligations regarding engine design (*see* 14 C.F.R. Parts 21-33), not an *airline*'s obligation to operate an airworthy aircraft (*see, e.g.*, 14 C.F.R. § 125.91(a)).  Second, while *Sikkelee I* recognized that federal law did not comprehensively establish a standard of care for the design of aircraft engines, that is not true as to aircraft exterior lighting.  Federal regulations address the precise concern Plaintiffs raise and set a standard for the brightness of exterior lighting to avoid collisions.  *See* 14 C.F.R. § 25.1401(d)-(f).  The government agrees.  U.S. Br. 4.

th[ese] assessments carelessly or recklessly" (Opp. 37)—the regulations set numerous standards and requirements for airlines' safety risk management programs, which the FAA approves and monitors. 14 C.F.R. §§ 5.1, 5.7; FAA Order 8040.4C. But Plaintiffs have not alleged a violation.

### d.  Flight scheduling

American explained (at 30-31) that federal regulations exclusively govern the scheduling of flights at DCA. 14 C.F.R. Part 93 Subparts K & S. The FAA uses a federally designed "slot system" to manage the frequency of flight arrivals and departures for air traffic purposes. 14 C.F.R. § 93.123(b)(3) ("37 IFR reservations per hour" at DCA). The FAA has sole authority to adjust the number, timing, and order of operations at DCA to ensure safety. *Id.* § 93.130. It retains significant regulatory flexibility to adapt DCA flight schedules to address safety concerns, including by reducing the slots and frequency of landings to space them more strategically. *Id.*

Because this intricate federal regulatory scheme controls flight scheduling at DCA, Plaintiffs' scheduling claims are preempted. Plaintiffs do not (and cannot) allege that American breached any of these federal regulations because the FAA approves its flight schedule at DCA. 14 C.F.R. § 93.125. Plaintiffs offer no response other than they "do not bring any separate scheduling 'claims.'" Opp. 39. Plaintiffs concede they cannot state a claim premised on scheduling.

### 3.  Plaintiffs' claims fail even under a conflict preemption analysis.

As we have explained, Plaintiffs' claims all directly implicate aspects of aviation safety that are—for good reason—extensively regulated by the federal government. Because exclusive federal regulation in each of these areas is necessary to maximize aviation safety, Congress intended to occupy the field of such regulation and preempt alternative state standards of care. Plaintiffs' failure to allege that American breached any of those standards should end the analysis.

Plaintiffs nonetheless argue (at 20, 34) that conflict preemption principles should instead apply as to their claims against American, but even this framework would not save their claims. "[S]tate law is still preempted to the extent it … is impossible to comply with both state and federal

16

law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984) (citations omitted). Although they remark (at 20) that "Defendants do not—nor could they—argue that Plaintiffs' allegations conflict with any federal regulation," Plaintiffs are mistaken on both points. American previously explained (at 24-25, 26-27, 28 n.7, 30) that—though not necessary for field preemption—American could not "comply with [its] duties under federal law and the duty of care under District of Columbia law" that Plaintiffs would impose (Opp. 20).

Plaintiffs do not respond to American's argument (at 24-25) that federal law *prohibits* American from controlling PSA—an air carrier with a distinct operating certificate—in the manner Plaintiffs allege it should have. *See* 14 C.F.R. § 121.533(a) ("Each certificate holder conducting domestic operations is responsible for operational control."). It would thus be "impossible to comply with" this federal regulatory requirement and the state-law duties Plaintiffs seek to impose. *Silkwood*, 464 U.S. at 248; *e.g.*, FAA, *FAA Revokes AMI Jet Charter's Certificate* (Oct. 31, 2007), perma.cc/K59G-HBFY (revoking air carrier certificate for ceding control to another carrier).

Nor do Plaintiffs offer much response to American's arguments (at 26-27, 28 n.7, 29, 30) that their claims presume FAA approvals of their desired training programs, aircraft lighting, or flight schedules. *See PLIVA, Inc. v. Mensing*, 564 U.S. 604, 620 (2011) (inability to "independently do under federal law what" plaintiffs allege "state law requires" compels preemption). Plaintiffs do not address *PLIVA*; they only make undeveloped references (at 37-38) to *Sikkelee v. Precision Airmotive Corp.*, 907 F.3d 701 (3d. Cir. 2018) (*Sikkelee II*), asserting that "FAA would be unlikely to refuse such … change[s]" (*id.* at 38), an unalleged assertion lacking any support. FAA must optimize safety systemically; that brighter lights, for instance, might increase an aircraft's visibility to certain others does not necessarily make aviation safer on balance. *See* 14 C.F.R. § 25.1395 (setting *maximum* light intensities). Regardless, *Sikkelee II* did not squarely address this argument because "the parties agreed that Sikkelee's proposed change to the

carburetor's design" would not have required FAA approval. 907 F.3d at 711-712; *id.* at 717 (Roth, J., dissenting) ("the Majority misframes the applicable regulatory regime, which requires prior FAA approval for all changes" so "*PLIVA* … control[s]").

Because American's compliance with the state-law duties Plaintiffs allege would, at a minimum, "stand[] as an obstacle to the accomplishment of the full purposes and objectives of Congress," if not make it downright "impossible to comply with both state and federal law," Plaintiffs' claims are preempted even under a conflict preemption analysis. *Silkwood*, 464 U.S. at 248.

### B. The Airline Deregulation Act expressly preempts the scheduling claims.

American explained (at 31-33) that Plaintiffs' scheduling claims (relating to alleged grouping of flights at the bottom and top of an hour (*see, e.g.*, Compl. ¶ 208(n))) are preempted by the Airline Deregulation Act's express preemption provision. That statute prohibits states from "enact[ing] or enforc[ing] a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation." 49 U.S.C. § 41713(b)(1). Because Plaintiffs' scheduling claims plainly "relate[] to" American's "service[s]" and "route[s]," they are preempted under Section 41713(b)(1).[9] The United States agrees that these claims "are expressly preempted by the ADA." U.S. Br. 2-3.

Plaintiffs offer virtually no rebuttal to the straightforward statutory text. They do not dispute that American's FAA-approved scheduling of flights into DCA under FAA's slot system goes to the essence of American's air transportation "service" or "route[s]." 49 U.S.C. § 41713(b)(1); *see Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259, 1266 (9th Cir. 1998) (en banc) (holding that an airline's "service" includes, at a minimum, "the provision of air transportation to and from various markets at various times"); *Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 337 (5th Cir. 1995) ("'Air Service' referred at the time of [the Airline Deregulation Act's enactment] to the point-to-

---

[9]    Plaintiffs do not dispute (Opp. 39-42) that "other provision having the force and effect of law" includes "common-law claims." *Nw.*, 572 U.S. at 284; Am. Mot. 32; U.S. Br. 2.

point transportation of passengers … and it encompassed … schedules."). As the government explains (at 3), any definition of "services" encompasses American's scheduling of flights. A claim that challenges the reasonableness of American's scheduling of flights at certain times thus necessarily "relate[s] to" its "service[s]" and "route[s]," implicating precisely the kinds of issues Congress wanted to preempt from state regulation. 49 U.S.C. § 41713(b)(1); *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378 (1992) (Congress determined "that maximum reliance on competitive market forces would best further … variety and quality of air transportation services" (alterations adopted and quotations omitted)).

Rather than address this directly, Plaintiffs cite various cases they assert establish the broad point that "personal injury claims" do not "fall under the scope of economic regulation Congress sought to preempt" (Opp. 40)—ultimately because, Plaintiffs assert, they "do not 'seek to dictate' 'when and how often American flies into DCA.'" Opp. 42. Each aspect of this argument is wrong.

When and how often an airline flies into DCA is *exactly* what Plaintiffs' state-law claims would regulate. Plaintiffs allege that "American was negligent and breached the duties it owed to [Plaintiffs] … by deliberately scheduling more flight arrivals, including the arrival of AE 5342, in a cluster at the bottom of one hour and the top of the next to circumvent the limits upon arrivals at DCA … thereby reducing the already strained safety margins at DCA." Compl. ¶ 208(n). The only way American could avoid liability under this theory is by changing its FAA-approved schedule into DCA. Thus, Plaintiffs' state-law tort theory would immediately cause state law to regulate American's "service[s]" and "route[s]"—contrary to the ADA. 49 U.S.C. § 41713(b)(1).

That is why, in conducting the ADA preemption analysis, courts consider what conduct the asserted state-law claim, if accepted, would regulate. As the Supreme Court has observed, "some state actions" may affect airline services in "too tenuous, remote, or peripheral a manner to have pre-emptive effect." *Morales*, 504 U.S. at 390. But *Morales* explains that "[t]he ordinary meaning of ['relating to'] is a broad one … and the words thus express a broad pre-emptive

19

purpose." *Id.* at 383.  The Court's observation of some limit on the phrase's scope simply disposed of a state's concern that the Court's decision would "set out on a road that leads to pre-emption of state laws against gambling and prostitution as applied to airlines." *Id.* at 390.  But like in *Morales*, "the present litigation plainly does not present [such] a borderline question": there is nothing "tenuous" about Plaintiffs' scheduling claims' "connection with" American's "services." *Id.* at 384, 390.  Plaintiffs would have state law *directly* regulate an airline's routes and schedules into DCA.

The authorities Plaintiffs invoke are readily distinguished by considering what conduct the state-law claims in those cases would regulate.  *Day v. SkyWest Airlines* concerned a passenger's "personal injuries she allegedly sustained when a SkyWest flight attendant carelessly struck her with a beverage cart."  45 F.4th 1181, 1182 (10th Cir. 2022).  *Day* recognized that state laws that do not immediately refer to airline routes or services would be preempted if they nonetheless, among other things, either "govern[] a central matter of an airline's prices, routes, or services" or "will have acute economic effects that effectively limit airlines' choices regarding their prices, routes, and services." *Id.* at 1186.  The claim in *Day*—a personal injury claim from being struck by a drink cart—was not preempted because the duty imposed "would not force SkyWest to remove, add, or modify any of its prices, routes, or services." *Id.* at 1188-1189.  Here, by contrast, Plaintiffs immediately seek to use state law to alter how and when an airline flies to DCA.

*Charas v. Trans World Airlines, Inc.* is entirely unhelpful for Plaintiffs.  160 F.3d 1259, 1266 (9th Cir. 1998) (en banc).  There, the Court found tort claims could proceed because it construed the ADA's term "service" to not refer to conduct such as "the pushing of beverage carts, keeping the aisles clear of stumbling blocks, [or] the safe handling and storage of luggage"— regulation of that conduct, the Court concluded, was not preempted by the ADA. *Id.* at 1266.  But *Charas* explicitly contrasted such conduct with the heartland of ADA preemption—"the provision of air transportation to and from various markets at various times." *Id.*  Plaintiffs have no response.

As for *Hodges*, American surely has not argued that the ADA's express preemption

provision preempts any claims involving "a fatal airplane crash."  44 F.3d at 337-338.  American

has limited its ADA arguments to Plaintiffs' theories that *are* within the ADA's ambit—Plaintiffs'

scheduling theory—because imposing liability based on that theory would require American to

alter its routes and services.[10]  As to Plaintiffs' other claims, American does not contend the ADA

expressly preempts the claims.  Rather, federal law dictates the duties owed.  *Supra* at 3-16.

Because Plaintiffs' scheduling claims would cause state law to regulate how and when an

airline flies into a particular airport, the ADA expressly preempts those claims.

### C.    Plaintiffs have not alleged American owed them a duty.

Plaintiffs' claims against American also fail because—preemption aside—Plaintiffs have

not pleaded any plausible theory that American owed them a relevant duty.  Plaintiffs lump to-

gether claims and arguments against American and PSA, hoping to ensnare American with liability

for alleged acts of PSA, Flight 5342's undisputed operator.  But conclusory assertions that Amer-

ican owes a duty simply because it is a corporate affiliate of PSA or markets PSA flights do not

plausibly allege that American owed a legally cognizable duty to Flight 5342's passengers.

Plaintiffs have not shown how American owed a duty to oversee "the operations and pro-

cedures of its holding company's subsidiary."  Compl. ¶¶ 193, 200, 207, 214.  American's alleged

failures all amount to things it should have done to better control PSA: the complaint's Third and

Fourth causes of action fault American for "allowing PSA" to do things, or "failing to require

PSA" to do other things.  *Id.* ¶¶ 208, 215.  But all those allegations *presuppose* a duty to control

PSA; they do not *establish* a duty.  "[I]f there is no duty, there can be no breach, and hence no

negligence."  *Magee v. Am. Inst. of Certified Pub. Accts.*, 245 F. Supp. 3d 106, 113 (D.D.C. 2017).

Recognizing this problem, Plaintiffs argue (Am. Opp. (Dkt. 67) at 10) that American

---

[10]   There is thus no inconsistency between American's position here and its position in *American Airlines, Inc. v. Wolens*, 513 U.S. 219 (1995).  *Cf.* Opp. 40 n.6.  American does not contend that the ADA expressly preempts all accident-related claims.  It preempts just those theories that would cause state law to directly regulate routes and services.

"assumed … and retained control over key aspects of flights it marketed."  But as American ex-plained (at 36-37), merely selling tickets cannot impute a general duty to American, or else the major airlines that sold tickets for regional affiliates would have been held liable—but were not—in *Hart v. Delta Air Lines, Inc.*, 2018 WL 1087846 (C.D. Cal. 2018), *Freese v. Continental Air-lines, Inc.*, 2009 WL 2232857 (N.D. Ohio 2009), and *In re Air Crash at Lexington, Aug. 27, 2006*, 2008 WL 2945944 (E.D. Ky. 2008).  Section 324A of the Restatement (Second) of Torts—which Plaintiffs invoke (at 7-8)—makes this common-sense point plain:  one must "undertake[] … to render services to another" for a legal duty to a third party to arise.  The complaint, however, does not allege that American rendered any "services" (Am. Opp. 8) to Plaintiffs for PSA other than selling tickets for the PSA flight.  Compl. ¶¶ 46-48.  Nor does it allege other facts to plausibly establish that American "retained control" over flights operated by another carrier.  Am. Opp. 10.

Plaintiffs' retort (at 12-13) that those cases were decided on summary judgment—and thus discovery is warranted into American's relationship with PSA—disregards their procedural histo-ries.  In each case, the plaintiff(s) alleged that the national marketing carrier *operated* the relevant flight, so the airline defendants did not move to dismiss the complaints on those grounds.[11]  The courts thus *could not find* that the national marketing carrier did not owe a duty to plaintiffs on a flight they did not operate until summary judgment.  Here, however, Plaintiffs expressly alleged that American did *not* operate Flight 5342.  *See* Compl. ¶ 48 ("PSA operated [Flight 5342] for American."); *id.* ¶¶ 7, 46, 47 (PSA as operator); *id.* ¶ 236(a)-(g) (alleging claims concerning Flight 5342's operation against PSA, not American).  There is thus no "(disputed) factual assertion" (Am.

---

[11]  Compl. ¶¶ 7, 23-25, *Freese*, No. 1:08-cv-1070 (N.D. Ohio Apr. 25, 2008), Dkt. 1-1 (referring to Continental's "passengers" and "employees" on "Continental Flight Number 2243"); Compl. ¶ 55, *Hart*, No. 2:17-cv-4695, (C.D. Cal. June 26, 2017), Dkt. 1 ("Delta and/or SkyWest owned and/or operated the aircraft"); Amended Compl. ¶¶ 3, 14-15, 50, *In re Air Crash at Lexington*, No. 5:06-cv-316 (E.D. Ky. Nov. 3, 2006), Dkt. 104 ("Delta … was in a joint partnership, joint venture, agency, apparent agency … relationship with Defendant Comair" and "had a duty to exercise or-dinary care in the operation of *its* aircraft utilized on Flight 5191") (emphasis added).

Opp. 12) that American controlled Flight 5342—Plaintiffs have pleaded out of that theory.

Without any allegations to fall back on, Plaintiffs tellingly resort to new, unalleged theories and discovery materials to propose a possible source of this duty. But "[i]t is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss." *Quaid v. Kerry*, 161 F. Supp. 3d 70, 72 n.2 (D.D.C. 2016). These unpleaded theories cannot salvage their claims.

Their first suggestion (at 10, 12-13) that contracts between American and PSA might serve as the duty's source appears nowhere in the complaint and is contrary to federal law. Plaintiffs have not alleged "contours" of such a theory (*id.* at 12), nor would discovery illuminate the "control" Plaintiffs imply—for good reason: American *cannot* "control" PSA, a distinct "certificate holder … responsible for [its own] operational control." 14 C.F.R. § 121.533(a); *supra* at 17.

Plaintiffs' new argument that American can be held liable for PSA's actions based on agency or apparent authority likewise fails. Am. Opp. 13-19. The terms "agent," "agency," and "apparent authority" appear nowhere in the complaint, except in reference to employee "agents" of the government. Nor are there allegations to support an agency relationship between American and PSA. Plaintiffs' citations (Am. Opp. 14) to the complaint are downright puzzling—paragraph 87, for example, alleges that "[a]ir carriers are responsible for establishing their *own* policies and procedures." Far from supporting an inference of agency, the allegations prove the opposite.

The complaint does not plausibly allege apparent authority either. As Plaintiffs' own cited authorities show, the legal standard for apparent authority requires a third party to "reasonably believe[]" there is an agency relationship. *Restatement (Third) of Agency* § 2.03. Although the complaint alleges that "[p]assengers are often unaware they purchased a ticket for an American Eagle flight operated by PSA and not a flight operated by American" (Compl. ¶ 47), it is unreasonable for such a passenger to believe that American operates that flight when American discloses "prior to the purchase of a ticket the name of the air carrier providing the air transportation," especially when this information for internet sales is "provided on the first display of the Web site

following a search of a requested itinerary in a format that is easily visible to a viewer." 49 U.S.C. § 41712(c) (cleaned up); *see* 14 C.F.R. § 257.5(c). Without an allegation that American violated this federal disclosure standard—which Plaintiffs have no basis to allege—the complaint has not alleged apparent authority.[12] *See* 49 U.S.C. § 41712(c); 14 C.F.R. § 257.5(c).

**D.    The common carrier claims should be dismissed for additional reasons.**

Besides federal law preempting any "common carrier" duty,[13] Plaintiffs' "common carrier" claims against American fail because (1) American was not the common carrier for Flight 5342's passengers, and (2) "common carrier" is not an independent cause of action. Am. Mot. 37-39.

**1.**    American cannot be liable under any common carrier theory because it undisputedly was not the operating carrier for Flight 5342. As American described (at 37-38), courts consistently hold that an airline does not become a common carrier for a flight it does not operate simply by marketing tickets. *See Haley v. United Airlines Inc.*, 2015 WL 5139638, at *3 (N.D. Ill. 2015); *Freese*, 2009 WL 2232857, at *6, *aff'd in relevant part*, 412 F. App'x 770 (6th Cir. 2011). Plaintiffs do not dispute this legal rule—nor do they cite any contrary authority.

Plaintiffs instead argue that "[a]t this juncture," they need only allege that American is "a common carrier" and can later establish an exception from the "general[]" rule that common carriers "are generally not liable for injuries that result from a cause beyond their control." Am. Opp. 21 (quoting *Haley*, 2015 WL 5139638, at *2). But *Haley* never suggests that simply being *a* common carrier can make one liable for *another* common carrier's passengers. Rather, it held that "while [United] may be a common carrier," what mattered was that "it did not operate the subject

---

[12]    Plaintiffs rely on two cases predating enactment of this federal disclosure requirement. Am. Opp. 17-18 (citing *Shaw v. Delta Airlines, Inc.*, 798 F. Supp. 1453 (D. Nev. 1992) and *Momen v. United States*, 946 F. Supp. 196 (N.D.N.Y. 1996)); *see* Pub. L. No. 111-216 § 210 (Aug. 1, 2010). The court that considered this issue *after* the statute was enacted found "compliance" with this requirement to conclusively preclude "a reasonable inference" that any different carrier was operating the flight. *Hart*, 2018 WL 1087846, at *3.

[13]    Plaintiffs recognize (Am. Opp. 20) that, if American and PSA are correct about federal preemption, their "common carrier" theories are preempted by federal law.

flight." *Id.* at *3.  Again (*see supra* at 22), it is insignificant that *Haley* was decided at summary judgment because the plaintiff *had* alleged that the national airline marketing the flight was the flight's operator, so United Airlines did not move to dismiss.  *See* Compl. ¶¶ 10, 16, *Haley*, No. 1:14-cv-2614 (N.D. Ill. Apr. 11, 2014), Dkt. No. 1 (alleging "United Airlines was responsible for the operation of the subject aircraft" and plaintiff was one of "its passengers").

Here, however, Plaintiffs expressly alleged that American did *not* operate Flight 5342.  *See supra* at 22-23.  The First and Second counts should be dismissed for this additional reason.[14]

**2.**  There is no independent cause of action, moreover, for common carrier liability.  In the minority of jurisdictions that apply a heightened common carrier duty, such a duty is described within the framework of a common law negligence claim.  *See* Am. Mot. 39 (collecting cases).  Plaintiffs do not argue otherwise—and thus these claims are improperly duplicative.[15]

## CONCLUSION

The Court should dismiss the claims against American with prejudice.

---

[14]  Plaintiffs' discussion of a supposed "common law nondelegable duty rule" (Am. Opp. 21-23) is circular.  It presupposes that American, rather than PSA, was the common carrier of Plaintiffs— the very point American contests.  *Kelley v. United Airlines, Inc.*, 986 F. Supp. 684, 686 (D. Mass. 1997), involved the actual operator of the flight (United) and its contract with a wheelchair provider.  No such relationship between American and passengers is present here.  *See id.* ("The duty of a common carrier of passengers to exercise the requisite degree of care for those *it* undertakes to transport *upon its facilities* is nondelegable.") (emphasis added); *Alaska Airlines, Inc. v. Sweat*, 568 P.2d 916, 926 (Alaska 1977) (same, holding that "the traveling public is entitled to look for protection to the certificated carrier responsible for the scheduled route").

[15]  Plaintiffs assume D.C. law applies.  Am. Opp. 19-20.  The United States also makes arguments regarding choice of law.  U.S. Br. 4-5 & n.2.  The choice-of-law analysis here is complex—and may be important to other issues.  Complete briefing thus may be needed before the Court adjudicates what law applies, a determination it need not make now:  American and PSA argue that the common-carrier liability theories are (a) preempted, (b) inapplicable to American, and (c) duplicative of the negligence claims.  These arguments are agnostic as to choice of law.

When it becomes relevant, American and PSA reserve all rights to present argument on choice of law.  In any event, Plaintiffs are mistaken about D.C. "common carrier" law.  For common carriers, "the standard of care in D.C. is reasonable care."  U.S. Br. 5.  The D.C. Court of Appeals "has never imposed a higher duty on common carriers or extended liability beyond standard negligence … principles."  *Sebastian v. D.C.*, 636 A.2d 958, 962 (D.C. 1994).

Dated:  January 30, 2026

Respectfully submitted,

/s/ *Robert J. Burns*
William F. Gould (Bar No. 428468)
HOLLAND & KNIGHT LLP
800 17th Street, NW
Washington, DC 20006
(202) 955-3000
william.gould@hklaw.com

Steven Raffaele (Bar No. NY0685)
Robert J. Burns (Bar No. NY0682)
Sarah Korapaty (Bar No. NY0684)
Qian (Sheila) Shen (Bar No. NY0693)
HOLLAND & KNIGHT LLP
787 Seventh Avenue
New York, NY 10019
(212) 513-3200
steven.raffaele@hklaw.com
robert.burns@hklaw.com
sarah.korapaty@hklaw.com
qian.shen@hklaw.com

/s/ *Paul W. Hughes*
Paul W. Hughes (Bar No. 997235)
Sarah P. Hogarth (Bar No. 1033884)
Mary H. Schnoor (Bar No. 1740370)
Alex C. Boota (Bar No. 90001014)
MCDERMOTT WILL & SCHULTE LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mwe.com
shogarth@mwe.com
mschnoor@mwe.com
aboota@mwe.com

*Attorneys for Defendants*
*American Airlines, Inc. and PSA Airlines, Inc.*